v. Nicholas Muzin, et al., state of Utah, appellant Mr. Zients, for the appellant, Mr. Zissar, I mean just your AI, Mr. Saunders, for the appellee, jurisdiction issues, Mr. Benson, for the appellee, the anti-convention issues. Morning, counsel. Mr. Zients, please proceed when you're ready. Thank you, your honor. May it please the court. The district court made two important errors that harm Cutter's rights and interests as a sovereign. First, the court held that the Vienna Convention on Diplomatic Relations is categorically inapplicable to documents, archives, and correspondence whenever they are freely given to a non-mission party. Second, the court held that principles of international comedy are also categorically inapplicable when discovery is sought from a private party that is U.S. national. This court should reverse both rulings and remand with appropriate guidance for the district court to conduct a document-by-document assessment. In doing so, the court should reject two arguments that have been advanced to limit Cutter's protections. I mean, I assume if we did agree with you that the Vienna Convention is not categorically off the table and we were to remand, I mean, how do we articulate the standards that the district court should apply? Since we don't have the documents before us, we don't have any sense of what type of issues are going to arise in that document-by-document consideration. Sure, Your Honor. I think it's unfortunate that, frankly, Cutter's request to develop this in a concrete way with a log is not where we are, but we are where we are. We do think it is in the interest of the sovereign, of the parties in this case, of the district court, to at least get into some of these issues. So, for example, we know that there is this issue of FERA. There is this issue that's been raised about the contract. We know that there will be issues about the standard for documents that are generated by the contractors that incorporate it. I mean, is it your view that it's sufficient for us just simply to reverse and not provide guidance? Your Honor, I think, in our view, the district court was wrong as a matter of law and the court should reverse and hold that the categorical rule it adopted was incorrect and the process needs to start. Obviously, the documents aren't here. There has been no log, so we think there's going to be a lot of work to do in the district court. Our request would be that it would be in the interest of all parties and the district court if the court did go a step beyond reversing that categorical rule. What does that look like, I guess, is my question. Sure, Your Honor. So, I think we would start with a point of agreement with the United States about what documents of the mission means that are entitled to inviolability. We have offered certain factors. I think those are really, in our view, more granular ways of getting at some of the things that the United States government was talking about in terms of a special relationship, looking to what is the purpose of the engagement and of the work the contractors were doing related to the mission's performance of its functions. Was there an expectation of confidentiality? Was the mission exercising control and treatment for those documents and information? So, I think that is the first step. That's the standard that we would suggest. And then I think there are these sort of secondary issues that have arisen. So, take one, this argument that Mr. Brody makes. The United States did not endorse this argument, but this idea that because of this existence out there of a possible FARA inspection right, that means that the expectation of confidentiality vanishes. If that were accepted on remand, I think that would maybe entirely or pretty close to entirely end it. So, we think that is something that the court should also address as well. That seems to me to be a very tricky question because it seems, at least from the briefing and records, that the application of FARA is, you know, it's often worked out between DOJ and, you know, diplomatic missions. And so, our stepping into that with some type of standard seems like a difficult place for this court to be without more knowledge of whether FARA will even come up with respect to the particular documents at issue. But you're saying that we should address that question. That seems to me to be a very tough question. Your Honor, I think there's two aspects of that question, one of which I agree is very difficult and we do not urge the court to decide, even though it was raised by Mr. Brody's arguments, and the other, which I think is a much less fraught path. You know, our view is that probably the better practice is not to get into this question of if you had a clash between sovereigns where the United States Department of Justice said, we want to inspect these records of a contractor of a mission. And then the sovereign representing that mission came in and said, no, some of these records are documents of the mission and they're inviolable under the Vienna Conventions. You know, we think that is a legitimately hard, difficult problem. I completely agree, Judge Royale, with your point that this tends to be worked out between sovereigns. And I think unless and until, you know, two sovereigns can't work that out, that that is an issue, you know, better left for another day. You know, our view on how this case, how this issue should be resolved is to say, let's assume for the sake of argument that DOJ does have these inspection rights. It is, that does not mean that the expectation of confidentiality that the mission has in the documents held by the contractor are completely banished. So we have this possibility that maybe DOJ will exercise inspection rights and maybe, you know, that maybe the sovereign will or won't object. Maybe that will be worked out some other way. But we think that, you know, that doesn't change the fact that in this civil case, there is no, there is still a reasonable expectation of confidentiality that when the mission shares with its contractors for the purposes of assisting it in its diplomatic mission. So that's not, the United States gives the example of stuff getting posted on the internet. That's not anything close to what we're talking about with this hypothetical possibility of a DOJ inspection. So that's the path we suggest the court would go down. It does leave for another day. I'm interested in a whole nother path going down. Perhaps it's the whole district court judging me. But I want to ask you some questions about the motion to dismiss this appeal. Do you think, as a general matter, that it should be easier for a non-party to get interlocutory review than a party in a civil case? Your Honor, you know, one of the two grounds for interlocutory review here is the parliament doctrine. And so under that doctrine, under this court's precedent applying for it, I think there are cases where an appeal would be available to a non-party but not to a party. I don't think the court needs to get into that because this is, regardless of who is appealing, I think under the collateral order doctrine, this is appealable. But I think the concept of the parliament doctrine is that there could be cases where if you were a party, you would essentially have to go the contempt route if you wanted to appeal. But a non-party may have a separate basis to appeal. When has the collateral order doctrine been used with respect to a non-party? Can you describe the case? Your Honor, I think this court's sealed case did rely on the collateral order doctrine. Now, I think Mohawk may have undermined the particular collateral order holding in Mohawk. But if that was a case, you know, zooming out, it's a conceptual matter where a non-party to the case filed a notice of appeal. And this court entertained that appeal both under collateral order and homing grounds. So I've looked at a bunch of our cases in the Supreme Court cases invoking either the collateral order doctrine or the Perlman doctrine. And I can't find a single one where the appellant wasn't at least a movement of some sort in the district court. Where they filed either a motion to quash, where they filed a formal objection, where they sought some sort of relief. And then they were appealing the denial of the specific relief that they sought. You didn't do that here. Your Honor, I think we did. This case is complicated because Qatar is a foreign sovereign and because it was essentially facing the threat that if it intervenes, you know, the serious concern that Mr. Vordy would contend that that was a waiver. Who cares what he would contend? I mean, we have held since at least 1980 in the U.S. v. AT&T case that a non-party can intervene for the limited purpose in a civil case to assert a privilege in the discovery dispute. And there's nothing in the text of 1605A1 or 1607 that suggests that that limited intervention is going to waive sovereign immunity to be able to assert some sort of claims against Qatar. And the fact of the matter is that you could have sought such limited intervention consistent with our practice and what the Supreme Court says is the preferred way of proceeding. And then if your limited intervention had been denied you, then you could seek interlocutory appeal of that denial along with consideration of the merits of the dispute. And we wouldn't have this situation where we don't know what you are. You fish or foul. We don't know. You're an amicus. You can't preserve arguments as amicus below. We even have a rule where if you're a party and you don't join in a motion or an objection below, you can't assert it on appeal if you didn't join it. And that's if you're a party. So this is all a mess because you didn't pursue the option that was available to you to pursue. And I have a problem with that. Connor, a couple of responses to that. One, I do think when a sovereign is involved, it is something fraught. I agree with you that it would not, in fact, have been an implied waiver or triggered the counterclaim exception. I think a sworn sovereign has a legitimate, reasonable interest in not even being subject to that risk, not even being subject to having to defend that claim. We know the district court suggested that that is a complex question. We could have wound up with extensive proceedings both in the district court and the court of appeal. So I think that's just a factual response to the unique circumstances here. On the broader question of whether you need to intervene or need to be a movement in the district court, I think that's not what happened in this Court Shield case. It's not what happened in the Supreme Court's case in Devlin v. Scarletti. The Supreme Court engaged in— But there, the party was going to be bound by the order. Here, Cutter isn't bound by the discovery order. It's not bound in the sense that it's not directed at Cutter, but it is losing an immunity and a viability that Cutter claims. If bound went that far, then someone who had an attorney-client privilege or a work-product privilege that they were concerned about losing would be bound by a discovery order. And that's not the way that we—bound has a term of art that has a particular meaning. It means that the judgment binds you for attempt or other enforcement purposes or perhaps for res judicata or collateral estoppel issue reclusive purposes. And this doesn't do that. So you're not bound, so you don't fall within depth. Sure, Your Honor. I think that this Court in the Shield case referred to being bound or otherwise having interests affected and undermined. That's certainly what's happening. I think—certainly, I'm not saying that Devlin is factually on all fours. But I do think Devlin stands for—the Court says, first of all, this is not a question of Article III jurisdiction. That's satisfied by the personal state. It's not even an assessment of prudential standing. It's essentially a prudential rule about who has a right to an appeal. In the Court's analysis where it said there that intervention was not required for the absent class members, it is a very functional analysis. And that's why I think it is appropriate to look to these questions of whether a foreign sovereign should be put into this position. The only other thing I would say is, Your Honor— Also, you can say it's practical analysis on appeal. It's practical in the district court whether or not you formally intervene or not, at least for this limited purpose, so that you can preserve arguments so that it's clear what arguments you're making and what arguments we can hear on appeal, what record you want to make, what you want to put in the record, what specific procedure you want, so that we don't have a situation where we're trying to figure out on appeal, is this something that the defendant asserted, and did they make argument X, but you as an amicus made argument X prime? The defendant doesn't appeal, but you do? All of that could be solved if you had done what was available to you to do and which would provide no risk to you to do, because if you seek limited intervention and you're not allowed to intervene on the limited terms and conditions that you set forth, then you can challenge that. Your Honor, I respectfully push back on the no risk proposition there. I think that in deciding, in the state of credit deciding how best to assert its interests here, we did look for guidance on this, found this to be an uncertain playing field. I think going forward, if this court were to adopt a rule that said foreign sovereign that finds itself in this position should intervene, doing so will not be construed as any kind of waiver of sovereign immunity. If you don't do that, you're out of luck. I think that would be a perfectly reasonable and acceptable rule going forward. I think as applied to this case, the FSIA provides an exception for sovereign immunity to waivers that are implied. The district court, in this case, at least thought it was a complex question whether this would constitute a waiver of sovereign immunity. We had no appeals authority, any other authority to be able to say to a sovereign, you are not at any risk here by showing up and intervening for purposes of this discovery. Certainly, we might have said we think we would ultimately prevail there, but I really don't think it's no risk. I think it's no risk in the sense that the way that I understand intervener practice, and you can tell me if I'm wrong about this and direct me to a case, but when a party seeks limited intervention, like I've seen cases involving Indian tribes, et cetera, in the United States that have sovereign immunity, they can say, look, we want to intervene on this limited basis under these conditions where we are preserving and not waiving our immunity as to A, B, and C. We're only intervening on this limited basis, and if the district court agrees that that's appropriate after hearing from the parties and it grants that, and if it disagrees and says no, I think that if you intervene, you're going to waive this particular immunity that you don't want to waive. That doesn't mean that you are forced in under those conditions. You can challenge that in the court of appeals, and if the court of appeals finds that that's an abuse of discretion, then you can intervene on those terms, and if it disagrees and you don't want to intervene on those terms, then maybe we have a question as to whether or not you should be able to pursue this as something other than a party. I think in terms of foreign sovereign immunity, I'm just not aware of cases addressing this question. I think the analysis wouldn't necessarily be the same the way it works in tribal sovereignty, only because we're talking about a specific statute that has a specific implied waiver exception for sovereign immunity. So I do think that there was risk there, and this was a reasonable path under the circumstances, and that this question of who is entitled to appeal as a non-party is functional and equitable. As Devlin says, I would suggest the cases that this court cites in its footnote in the sealed case, when you look at how other circuits address this, it's quite an amorphous set of considerations that go to what's equitable, what's fair in the circumstances for whether a non-party is able to appeal. The last thing I would say on this is there is the possibility of construing this as a mandamus petition. The United States agrees with us that there was a clear error here in an entitlement to revand, and I think there's another option that may avoid some of these problems. The concern I have, the reason why I think we've got to go to first principles here is Mohawk. Mohawk seems to say that you've got to pick one door. You've got to either pick the interlocutory appeal door under the collateral order doctrine, or you pick mandamus. Because one of the rationales of Mohawk's holding is that, look, as a categorical matter, attorney-client privilege claims, we're going to say, are not subject to this collateral order interlocutory appeal doctrine, because there's a couple of things that you could do. You could perhaps suffer contempt, get direct appeal that way. You could ask for the order to be certified for interlocutory appeal. And if it's a novel question, then that's generally going to happen, and you get interlocutory appeal that way. Or if neither of those are really going to be available to you, then mandamus will be available to you. And so you don't go through this door. So I think we have to figure out, as a doctrinal matter, which door must you have to go through. And if it's the petition for mandamus door, the reason that that door would be available to you is because there's no other adequate relief that's available. So we have to, you know, make a decision as to whether, in these cases in general, that's the way that they're going to be handled. Not just we're handling it that way in this case because you didn't seek intervener status. I think if you could have and were supposed to have sought intervener status to deal with this, then the mandamus option shouldn't be available to you because you would – you should exhaust these other possibilities as seeking collateral review under ARDI. Sure, sure. I understand, Your Honor. And I think actually this court's decision in the prior void versus medicine appeal is actually a good example of how the court has addressed something, you know, for purposes of this case, but also going beyond. And what it said there was that case was entitled to a collateral order review. But because of what the court verified in that decision, other cases might not actually rise to the level. Here, I think the court could quite reasonably say, you know, going forward, if a foreign sovereign is in this position, it should intervene. And doing so will not constitute any possibility of a waiver of sovereign immunity. And if a sovereign is on notice of that going forward and tries to do it another way, then I think that would be a perfectly sensible rule going forward. And I think, you know, in terms of the solicitude owed to a foreign sovereign that the Supreme Court has said seeking to have its interests heard in U.S. courts, there just wasn't guidance for what to do in this circumstance. We think that this was a reasonable way for the state of Qatar, you know, faced with these risks, faced with these concerns to proceed. Can I ask one follow-up question that followed me earlier? Can you just state concisely what you think we should say about the FARA issue? I think that the court does not have to... If we get to it. Sure. If you get to the FARA issue, I think the court can say it is a hard question, you know, what would happen if DOJ was seeking to inspect records that a foreign sovereign claimed were inviolable documents of demission. I think in this case, the court can say that in this civil discovery dispute, you know, a hypothetical possibility the DOJ may in the future seek to inspect these records does not so undermine the expectation of confidentiality in those mission records, in those mission documents, that they cease to become documents of the mission under the standards that the United States and Qatar... The way that the FARA intersects with inviolability principles, and then we can always consider it in subsequent appeal if necessary. Your Honor, I certainly don't disagree that that's a path that's open to you. You know, Mr. Brody has raised, you know, objections to the possibility of this. In other words, you don't view that state of things in the district court to be such that if we get to that stage and if we were to send it back, that the issue of the way that the FARA intersects with inviolability is already a foregone conclusion in the district court. Your Honor, there is, I believe, a paragraph for some of the district court's opinion that does address that. It is sort of confirmatory, as I read the opinion, sort of confirmatory of the district court's broader textual... Other conclusion, but by hypothesis, we would have already... If we even get to that stage, then the premise would be gone. Correct. I think it would be open. You know, I think, you know, we're here as a non-party wanting to be heard, and if that means, you know, having this flushed down in the district court with the possibility of coming back if it results in another categorical ruling that we think is wrong, I think that's okay with us. I think the parties may have views about that, and we're not trying to be... But the way you read the state of things in the district court is that it would all be open. I think, by hypothesis, if the court rejected the district court's overall framework, adopted, you know, another one, perhaps one similar to the United States and Cutter's, I do think it would be open. My view, personally, is that it would be useful, but certainly, you know, I think we could make that argument. I have a question, another question about Mohawk. Mohawk, the Supreme Court said, we're not going to look at, like, creating whether this sort of discovery dispute involving the attorney-client privilege kind of falls within the third prong by looking at the facts and circumstances of any particular case. We're just going to make a categorical ruling that attorney-client privilege challenges don't meet this third prong of the coincidence, right? And they said, we're going to do that by looking at how much deferring review or the inapplicability of review, you know, would thaw and harm people who would seek to benefit from the privilege. And the court acknowledged that, you know, part of the argument here is that this type of privilege information should never be disclosed. But the court reaches the conclusion that, you know, notwithstanding all of that, we don't think that this is going to essentially have some sort of serious negative deleterious effect on people's ability to consult with their attorneys. Don't we have to, for you to prevail and for us to agree to hear this appeal, don't we have to kind of reach a conclusion contrary to Mohawk's analysis of attorney-client privilege or this particular privilege that you are asserting? All right. I agree that the analysis is categorical. So on the question of the federal order doctrine, the question is not, you know, is Cutter's specific claim here and the fact that this case, you know, effectively a reviewable question, I think I would phrase it as, you know, an objection to disclosure and discovery on the basis that something would violate the Vienna Convention on Diplomatic Relations. So I think you would go through the Mohawk analysis and the court gave a number of reasons why for attorney-client privilege, you know, an appeal at the end of, after a final judgment was enough and what the court said is as important as the attorney-client privilege rule. The rules of the road are known. This is well settled. Not much is going to be gained by all these appeals. There's going to be a lot that's lost by having all those appeals and the courts of appeals burdened with that. I think, you know, as the United States brief confirms here, what's at issue here is a question of the United States' compliance with its obligations under an international treaty. You know, as important as attorney-client privilege is, you know, that's something of a different order. It's not something, as the court emphasized in Mohawk, where there is sort of a well-tried analysis that the court of appeals have developed that there's not much of a chance of reversal on appeal. You know, these are complex and novel issues. So, you know, I think, you know, we have no problem with following the analysis in Mohawk. We just think it comes out in a different way here, just as, you know, this court, this has never reached the Supreme Court. This court routinely holds the denial of sovereign immunity because of the particular harms involved of forcing a sovereign who may be immune from facing the burdens of suit. So, you know, I think, you know, we have no problem with following the analysis in Mohawk. We just think it comes out in a different way here, just as, you know, this court routinely holds the denial of sovereign immunity because of the particular harms involved of forcing a sovereign who may be immune from facing the burdens of suit. Thank you. Now, Mr. Totaro. Thank you, Your Honors. Martin Totaro from the United States. If I could just briefly address the jurisdictional piece before moving to the merits. I think unlike evidentiary privileges that can be protected through an appeal with a remedy, if the defendants turn over inviolable documents, that's a value of a high order, not only because we're talking about U.S. treaty rights, but we're also talking about the United States obligation to safeguard those very rights. So, I think in that circumstance, with all the other distinctions with Mohawk industries we discussed in the brief, just a very different case. And then the final brief point I'll make is that this court, the first time this case was up on appeal, took a practical, pragmatic approach to appellate jurisdiction, and we think it should do so again here in the same way that it does when we're talking about an issue of foreign sovereign immunity, when we're talking about a violation where the harm occurs at the time of the violation that cannot be remedied on appeal. I'm asking, do reciprocity considerations come into play even with respect to jurisdiction? So, for example, I could understand that the United States would be concerned that if they were in a similar situation in a foreign jurisdiction, they would also want the ability to get its inviolability assertion heard as soon as possible before the documents would be disclosed. 100% correct. Yes, we agree. And should that be done by mandamus, or should that be done under the mandamus statement, which is different because you have to show kind of a clear right to relief, clear and indisputable, versus a non-party being able to prevail itself. Yes. Lesser standard of lateral order. Judge Wilkins, I think in this specific case, state government is agnostic, because whether it be through the collateral order doctrine and the lack of an effective remedy on appeal, or through mandamus, the district court's categorical approach, which we think was clearly in error, that could be resolved through mandamus as well. So, I understand, I take your point that in many cases, party, you're going to generally choose collateral order or mandamus. Here, I think regardless of which path the court chooses, all of the requirements are satisfied. So, it doesn't really matter in the United States how appellate jurisdiction is established, but the fact that it is established. So, as Chief Judge Sreenivasan pointed out, the foreign sovereign's treaty rights can be safeguarded. Just so that I'm clear about the United States' position, what do you think is the clear error, the Vienna Conventions analysis, or the international comedy analysis, or both? The clear error, Your Honor, and this can also lead me into the merits, is the adoption of a categorical rule that whenever documents are freely given to third parties, those documents necessarily fall outside of the Vienna Convention. And I'm happy to talk about why that's irreconcilable with the text purpose. You didn't even talk about international comedy in your brief. Yes, Your Honor, sorry, Your Honor. This court's order asks us to focus on jurisdiction and the treaties, and so the United States did so. And so, the United States hasn't offered an opinion on international comedy in this case, in this context. And so, I will address the text of the treaty, the purpose, practice, but at the outset, I wanted to be upfront. One critical concern to the United States is that the district court's categorical error poses a serious threat to how the United States operates its embassies overseas in terms of reciprocity. So, the United States, as a matter of, I don't know if routinely is the proper word, but it not infrequently uses outside contractors to carry out essential functions as defined under Article 50 of the Vienna Convention. This is most often seen in terms of embassy construction or security personnel. And as the government reads the district court's order, none of the very important documents that are provided to those individuals, including, for example, like blueprints of an embassy, would be protected by Article 24. And that, as a matter of possibility, is a very serious error, and it cannot be reconciled with the text of Article 24, which is talking about the protection of documents wherever they may be. Can you also speak to the question about the intersection between the Vienna Convention and FARA? Because, obviously, DOJ is the entity that enforces FARA. Do we need to say anything about that in this case? And, you know, do we need to? Should we? And what would that look like? I do not push back against the hypothetical or the question likely, but I think the court should be very careful about what it says about the potential intersection between the FARA and the Vienna Convention, because doing so could raise significant domestic and international concerns. There is no need for this court to address whether there is a potential conflict between the FARA and the treaty. And one potential way to avoid that issue would be through the framework we've adopted, which is to say, look, the text of the treaty does not resolve when documents given to third parties are, quote, of the mission, even though those documents would be subject to FARA inspection. The critical inquiry instead, as we know from international scholars like Zenta, is whether the entity had a reasonable expectation of confidentiality when it handed those documents over to a third party. And on that question, our brief provides a framework where we set forth three critical, or three factors that all point toward that overarching question of confidentiality. And then, to get directly to your point, as applied in this case, we have the text of the contracts between the mission and the particular consultants. That, in the United States view, allows this court to sidestep the direct issue of whether the FARA ever poses that conflict with Article. Well, suppose we disagree with that. Suppose we don't think that the boilerplate about as required by law, that's what you're talking about, right? Yes, sir. Suppose that we don't think that that resolves this issue. Then, I mean, I know your argument is that as required by law, FARA is a law, and therefore the contract already presupposes that documents can be turned over under FARA. But suppose we think that there's something to the other side's notion, which is, well, that's just circular because the whole question is whether it's required by law. Then, where are we with respect to FARA? And then, where does the United States think we should go in an opinion if all the other predicate steps get us to that? On the premise of the question, just to be clear, under Cutter's view, as required by law, there's no meaning whatsoever in the contract, boilerplate or not, because under Cutter's view, this is in footnote 11 of the brief, that only applies to documents that are of the mission anyway, and so that phrase need not be in there at all. And so those contracts could have very easily said, for example, consultants, while you may, under the laws of the United States, give those documents to the Department of Justice if inspected, under no circumstances can you give these documents to others in private litigation. But Cutter chose not to do that. And so our point is merely that when you hand over documents to a third party against the backdrop of FARA, that diminishes but does not eliminate the expectation of confidentiality. And to get to the point, well... I take that point, but suppose we just don't think that that's definitive with respect to FARA. Right. And so I think the problem there is that the document either is of the mission or it's not of the mission. And so a document can't be of the mission if it's requested, not of the mission if it's requested by the United States, but at the same time being of the mission when requested by a private party in litigation. So our point was merely that once you undermine that confidentiality expectation, it takes it out of the realm of being a document of mission. But I take the point that I don't want to fight gravity here, and if the court disagrees with that, one option which I think Cutter laid out on page 22 of his reply is to say, look, these documents might still be of the mission, but the contracts consented or waived any request by the United States, by the Department of Justice when we were in the land of FARA. So in that circumstance, the documents could potentially still be of the mission, but the court would need not have to address any potential conflict between FARA and the treaty because it would say, regardless of whether those documents are of the mission, even if those documents are of the mission, the government, the Qatari mission has consented to them being turned over by the United States. So if we were to remand and the district court concluded that a particular document was of mission and therefore inviolable, is it the government's view that they could still seek that document under FARA? If there had been a ruling by district court that it was inviolable in private litigation? I think so, Your Honor, because it wouldn't address this issue of consent or waiver, and so it would be, the district court would say, look, this seems like a very important document that satisfies the framework of confidentiality. And then it's just a separate question. And I think it would be important if the court went that route to make clear that it is a separate question when we're not talking about private party litigation, but when we're talking about the United States invoking its inspection rights under the statute. The reason why this hasn't popped up, I suspect, is because, as Your Honor noted, this tends to be done on a sovereign-to-sovereign basis as opposed to this rather unique situation. Then the result would be, though, and there is something intuitively at least possible about this result, is that inviolability prevents the document from being turned over in this kind of litigation. But it doesn't prevent the government from obtaining the document pursuant to FARA. And I think that would be because of some sort of consent that, again, that utter… So you think you'd have to point to something in the contract itself in order to reach that result. But for that, there's no way to reach that result? I think the contract is the easiest way to start the potential very thorny issue of whether if a document under remand is of the mission, whether the United States can invoke its statutory inspection rights without being in tension with Article 24. But, again, I cannot stress enough that I don't think the court needs to reach that direct issue. I think, rather, the more appropriate course is to say, Mr. Court, the categorical approach you adopted is incorrect. Here are the proper factors. And then focusing on the language of the contract, either agreeing with the United States position that this has significantly undercut or diminished the expectation of confidentiality, therefore probably taking those documents outside of mission status under 24, or the route that is proposed, which is to say put the documents at a minimum consent to inspection by the government. But that's a separate question entirely from whether in private party litigation they're subject to discovery. Or just leave that off. I'm sorry? Or just leave that off to be worked out on remand. I don't even know that… Why would we even have to do that? Why would we… I should send it back and say… It is certainly within the court's discretion not to do that. I think this is a situation where more guidance might be better than less just to provide the proper signposts so we're not here… If we thought we had enough information with which to give signposts, then… Yes. Yeah. As a factual matter, does DOJ litigate under FERA against foreign sovereigns? I'm assuming not very often, but I was just wondering as a factual matter. I'm fortunate that by no means, FERA or a criminal expert, I know these issues pop up. I don't know how many inspections there are here. I think it's something like 20 inspections, and I just don't know how often it gets litigated where… Well, I don't think it gets litigated, but I don't know how often a foreign sovereign comes in and says, Wait a minute here. We're dealing with very sensitive ground, and I think the lack of cases speaks volumes about to the extent it's ever addressed, how it's addressed at a more… Can I ask you, the government didn't reference Article 27 in its brief, I think. We did not. And is there a reason for that? We're not sure that Article 27.2 gives anything more that Article 24 otherwise wouldn't provide, and it seems like the clear thrust of Article 27 is talking about correspondence between the sending state and the embassy itself. I don't want to put forth a categorical position that the United States view that that's the only settlement in which Article 27 applies. But here, as I think the scholar I noted before, Denza, said it best, it seems that Article 27's protections are duplicative. So, I just don't think it does any work that Article 24 doesn't already provide. It's not just like I'm not sure that the Foreman Doctrine would do any more work than the Flateral Order Doctrine or the mandamus. And you don't think if Article 27 is narrower, then that narrowness gets read back into Article 27? No, I don't think Article 27 takes away anything provided. One last fair question. What triggers the inspection power or rights of the government? Is it just because they want to, or do they have to have some sort of cause or justification? Do they have to seek leave of court? What enables the government to inspect the records that are required to be kept? I'm not exactly sure what triggers the exception right, except I know you are subject to the regulations that get triggered when you have to register as an agent under the Foreign Agent Registration. I'm not sure, and I apologize, if there's not a second further step, I would be surprised if there were. The critical question, I think, is that question in the first instance of whether you need to register. So, we don't know whether you have to get a warrant or whether the FBI can just show up and say, you're registered under FERA. Here's all these records you're required to keep. We're here to see them. It's my understanding, as a matter of practice, this isn't something where federal agents are banging down your door. It's a collaborative process where there's an inspection that occurs, I think, either on premises or even, you know, through a server or whatever where the documents are put, and then the government can look at the documents. So, at least you don't have any reason to believe that a warrant or subpoena or some sort of court authorization is required for that inspection to occur. It could be very wrong, but I don't think so. I have one other question about, and this goes back to international comedy. So, I know you didn't address it in your briefing, you didn't have to, but you could have, because I don't think the order tabbing the grounds has pointed to particular grounds to the possibility. And I'm just wondering, do you have a view on that on behalf of the United States? Does the United States think that comedy adds anything when you've got something specific that deals with the terrain, like Article 24 does? So, the United States did not opine on that question, but the United States does not want the court to read into anything. Like, it's not that we think the government thinks that comedy plays no role here or can play a role on remand. We just have taken no position and instead we, you know, focused on the text of the court's order and rather compressed it. And what is, I know you didn't do it in your brief, but are you prepared to say anything about the government's view about comedy in the abstract here or the role that comedy may or may not have vis-a-vis the particular provisions in the conventions? No, Your Honor, we think this case can be resolved, this appeal can be resolved purely on the court's interpretation of Article 24. But I don't know about that, because if under the conventions, what the government wants is for us to remand and to have a document-by-document run-through to see if the factors are satisfied with respect to each document, which is where I think you are. Yes, Your Honor. Then there's at least conceptually a broader question, which is, would comedy come in and come across the board and say, you don't even have to do document-by-document? It's more wholesale than that. I'm not sure I understand how it would be more wholesale, but like category-by-category. I think the factors we set forth in the brief could go a long way toward the type of document-by-document or category-by-category of document review Your Honor is suggesting on remand. But we're not, I'm not saying that comedy should be foreclosed on remand. The government is merely, hasn't taken a position on the issue altogether, one way or the other. And comedy would not give Cutter any more than that, I assume. Because otherwise, then we'd do more than remand and just set up the factors because there'd be the potential that there'd be a greater grounds for what we'll call inviolability pursuant to an overhanging comedy document. I could imagine Cutter arguing something along the lines of apply the factors as set forth in the United States brief. But if there are close calls, then comedy could play a role in the district court's decision of whether a document is in or out. And on that issue, again, we don't have an issue, but I could imagine it playing a role. Again, thank you for giving us the opportunity to participate in the oral argument. Thank you, counsel. Mr. Saunders? Your Honor, it pleases the court. And I will be addressing the jurisdictional issues, turning it over to my partner, Mr. Benson, to address the issues regarding conventions and comedy. So, the two questions, separate questions that really need to be addressed at the outset, two separate hurdles that Cutter needs to overcome are, one, is the district court's discovery order granting the motion to compel appealable at this stage? And two, does the state of Cutter, a non-party who has not intervened, sought to intervene, has standing to appeal? And unless both of those preliminary questions are answered affirmatively, there is no need to reach any of the other issues that we've been discussing here today. Mr. Zias suggested, essentially, that this court should issue an advisory opinion regarding what would have happened if Cutter had sought to intervene for a limited purpose, and what effect that would have had on its sovereign immunity. We're not looking at advisory opinions here. I submit, let's look at where we are based on what has happened in the district court and where Cutter stands now. With respect to standing, we know that allowing non-parties to appeal, even a final judgment, is a rare exception to the general rule that only parties to a lawsuit, or those that properly become parties, can appeal an adverse judgment. Cutter talks about the in re-sealed case decision from this court, specifically a footnote that talks about standing. It's actually a dictum because the footnote itself makes clear that standing wasn't even challenged in that case. Of course, in re-sealed case, which relied on this court's decision in U.S. v. Philip Morris, was itself overruled by Mohawk. We're talking about their main authority for standing being dictum in a footnote in a sense overruled case. That footnote states that if the decree affects a third party's interest, he is often allowed to appeal. That was actually quoted language from the Fifth Circuit's decision in Castillo v. Cameron County, which was a case where a state that was itself a former party to the litigation was bound by an injunction that related to jail overcrowding, that it risked being found in contempt if it violated that injunction. The only other cases that Cutter relies on for standing are similarly cases where, such as Devlin, where the non-party was an unnamed member of a certified class that was bound by a settlement, or the Corana-Botis case from the Second Circuit, where the non-party was required to surrender property pursuant to an order of attachment. Can I ask you, do you agree that if there would have been an intervention, that there would not have been a waiver of sovereign immunity? I agree with Judge Wilkins that there's clear precedent for intervening for a limited purpose. Do you agree that there's a way that Cutter could have intervened, you could call for a limited purpose, such that they would not have waived their sovereign immunity, but still would have been able to assert the arguments that they're making? You know, I think it's an open question that would have to be resolved based on the specific arguments that they made in connection with the intervention. But the more it's an open question, I mean, if you're not able to agree to that, then it seems difficult to reach the conclusion that it should have intervened and not worried about waiving foreign sovereign immunity. Again, that would have been something that would have been addressed by the district court. As Judge Wilkins pointed out, it could have been taken up to this court if the district court had denied it, and that could have been resolved, but they didn't even attempt to do any of that. So that never ended up coming before the district court or this court. But as Judge Wilkins pointed out, the language from Devlin that Cutter relies on talks about non-parties being able to appeal if they are bound by the order that they're seeking to appeal. So what does it mean to be bound by the order? Again, we have cases where non-parties were bound by an injunction, non-parties were bound by an order of attachment. Cutter isn't bound by anything because the district court's order doesn't require it to do anything. Much more on point is this court's decision in Moten, which held that a party that had filed papers in the district court but had not sought to intervene and stood in the position of an amicus was not entitled to appeal and that this court had no jurisdiction. That's exactly what we have here. Just like the non-party in Moten, Cutter never sought to intervene. The district court ruled in its minute order of December 8, 2021, that Cutter would be allowed to submit statements of interest in the posture of an amicus, and Cutter did not appeal from that order. The order that said it only had amicus standard, it did not seek to intervene in response to that order. It accepted its limited role as an amicus curiae, and in fact, in its statement of interest that was submitted in connection with the motion to compel, Cutter stated, quote, pursuant to the court's order of December 8, 2021, Cutter files this statement of interest as the equivalent of an amicus brief. That's the Joint Appendix 227. So when they accepted their status as an amicus, in doing so, they accepted the consequences of that status, which is they don't get to appeal. Let me follow up on Chief Judge Srinivasan's question. Do you agree that if Cutter had filed a motion for intervention that says we want to intervene on the condition that we don't waive our sovereign immunity by this limited intervention, and if you, district court, are not willing to essentially rule that that will be the terms of our intervention, then we withdraw our request to intervene? So they made clear that, like, we are requesting to intervene only if we get a ruling from you that says that this will not result in a waiver, district court. Do you agree that they could have filed a motion to that effect? I agree they could have filed a motion to intervene under specific conditions, and if that motion was denied, then that motion would itself, I believe, be appealed to this court. And do you agree that they couldn't be kind of, like, forced to intervene on conditions other than what they request? I would agree. Either they intervene as requested in the motion, or if the district court finds that is not possible, they're not going to compel them to intervene if Cutter's not seeking to intervene. Cutter would not be seeking to intervene. In other words, they can't be compelled to intervene and waive if they say we only want to intervene if we're not waiving. I think that's correct, and if the court denies that, they can then make a decision. They can either accept that status, say we're not going to intervene, or we're going to intervene under the conditions that the district court allows for. We want to take up the decision to the court. And then if they do that, and the district court says in response, well, I don't know that you need to do that, because maybe we can just proceed so that you participate in the way that Cutter did, then your view would be that no, Cutter shouldn't accept that because they can get an up or down on the motion so that they can make sure that they preserve their status as an intervener with the party able to appeal. And they could say, no, we need you to resolve our motion, and if you don't, we're going to take that up because we want to make sure that we get a definitive resolution on whether we can intervene so that we can protect ourselves from the Cutter argument that we should have intervened. That's what should happen. I think that's correct. I see. That's quite intricate, but I take the point. But, you know, again, we're talking about a hypothetical scenario that just doesn't apply. We're looking at where we are today with a party that accepted its status as an amicus, did not seek to intervene, and is now seeking to claim standing under a dictum and a footnote in an overrules case. I see I'm out of time. If the courts indulge, I'd like to say a few things about the collateral order. Keep it brief. I'll try to keep it short. Thank you. All right. So I agree. Judge Wilkins, you said you haven't found a case under either collateral order or Perlman. Will the appellant present at least a movement in the district court? We're not aware of one either. Clearly, we know that under Mohawk, this is a discovery order. Discovery orders, including those rejecting claims of privilege, are not subject to the collateral order document, even though the Supreme Court recognized there may be some collateral damage. There may be some harm that is only imperfectly reverent. Now, Cutter tries to distinguish Mohawk by saying that the privilege here is on an entirely different level from the attorney-client privilege. But I point the court to pages 22 and 23 of Cutter's reply, where Cutter expressly analogizes the claimed convention protections to a series of attorney-client privilege cases. And this court itself has recognized the attorney-client privilege as inviolable. The government talked about once the documents are turned over, the convention is violated at that very moment. But once attorney-client privilege documents are turned over, the privilege is violated at that very moment too. And yet, under Mohawk, that itself is not enough to invoke the collateral order doctrine. And we'll submit on the Perlman doctrine on the briefs. We don't have a disinterested third party here. Everything in the record shows that. Mandamus, we don't have a clear abuse of discretion. We don't have a clear and indisputable right to relief. The district court relied on all available precedent in its reading of the conventions. And even should this court disagree, which we certainly don't think the court should, we think the district court's order was sound, it's not the type of rampant district court decision that is some type of usurpation of power as discussed in Mohawk that allows for Mandamus. And the last point I'd make before turning it over is this. I quote from this court's own opinion in the first appeal in this case on the immunity issue. The court said, quote, immediate appealability is strong medicine that is harmful when misused. We are now in this case that was filed nearly four years ago. This is the second interlocutory appeal. Discovery has still not even begun in earnest. The defendants have produced virtually no documents. If this court were to find that Cutter has standing, that this is an appealable order, and further remand to the district court for a document-by-document review, I promise you, I don't need a crystal ball for this, we're going to be back here on document-by-document appeals. Because Cutter's interest here is delayed. Judge Forrest in the Southern District of New York, when this same issue came up with Ben and Allahan's documents, and it sort of had its 281 about Cutter's tactics, it just smells like gamesmanship. So every determination that the district court makes regarding production of particular documents, not just discovery directed to the defendants, but there are third-party subpoenas that are out to other prior registered agents. As to all of those, Cutter is going to appeal those, every determination of turning over documents, as implicating its privileges and immunities, as implicating international comedy. We will have piecemeal prejudgment appeals that will be subject to tremendous delay and abuse. It will be five more years before anything happens in this case, clearly undermining efficient judicial administration and all of the other very real problems that the final judgment rule of Section 1291 was intended to. With that, I'll turn it over to Mr. Benson. Thank you. Thank you, Mr. Saunders. Mr. Benson. Good morning. May it please the Court, Daniel Benson for Appellees. Fortunately, that parade of horribles does not need to and should not take place. There is the government and Cutter's position that the order decision below was categorical is not really true. The judge made clear that she wasn't ruling on, for example, Bailey, Bailor Bailey situations or construction contractors or the like, that the order applies to these defendants with respect to these documents. And this Court can confirm on that basis. It doesn't need to issue an affirmance saying, you know, if any document is turned over to a third party, it's not no longer inviolable under the Vienna Convention. It's a more limited ruling. I'm not saying, by the way, that that is wrong. It may very well be right. There's a potentially correct argument that if a government turns over documents to a third party, by definition, they're no longer inviolable. But here we have a situation where Cutter put documents that contained highly confidential trade secrets, according to Cutter, in the hands of public relations blocks and lobbyists, even though it knew that those documents would be subject to inspection at any time on reasonable notice by the U.S. government. Isn't the district court's decision categorical as to, I mean, you agree that it's categorical as to these defendants? Yes, it is categorical. So how does that fit with the text of Article 24 of the Vienna Convention, which speaks of documents of the mission? It doesn't seem to speak to who holds them, but rather what the documents are. Well, the Vienna Convention was adopted after Farah had been in existence for probably 30 years. Well, just put aside Farah for a second. Just focus on the text of Article 24. Professor Denzel, who in the government and Cutter recognizes as the leading expert, has opined to Congress and in her treatise. She's the leading expert, if not the only expert, on the Vienna Conventions, and she's explained what that of the mission is, you know, that these documents, in fact, before Congress, she testified, and I recommend reading her testimony in full, but she testified and opined that documents that Saudi Arabia gave to public relations consultants were not of the mission and were not protected under the Vienna Convention. If the Vienna Convention had meant to protect those kinds of documents, it would have said, wherever they may be and whoever might be in possession of them, or even more to the point, wherever they may be and whoever may be in possession of them, even if those people who are in possession of them are subject to a host country disclosure requirement. It doesn't say that. It also doesn't say mission documents. It says documents of the mission, which suggests that they could be held by somebody other than the mission itself. That is, I think, overbroad. There was no intention to protect all documents of the mission. As Professor Dentz explains, it really meant documents that were, in effect, on the premises of the mission for diplomatic vouchers or the like. So what's your view as to when the mission stops, that once the documents leave the premises, they're no longer of the mission? Well, if they go to third parties, I think there's a very strong argument that they're no longer inviolable and no longer of the mission. Period. Whenever they're given to a third party. We don't have to reach that issue. And what's the narrower way to do it, then? Pardon me? What's the narrower way that you say you don't have to reach? If they're given to individuals in the host country who are subject to a disclosure requirement to the host country's government, So that's the fair argument there. So the broader argument would be once documents are given to a third party, they're no longer of the mission. Period. The narrower argument would be once documents are given to a third party and they're something like FARA, they're no longer of the mission. Correct. With the addition that once the, I mean, the reason for it, the first argument, is that the country's, in this case, Qatar, is not inviolable by giving them to third parties. So can I ask this? If Qatar invites a third party onto the embassy's premises and says, you're my contractor, I need you to do some work. In order for you to be able to do the work, I need you to look at some documents. But I'm really concerned about these documents, so I'd like you to come on my premises and look at the documents. I'm going to put you in a separate room. Here's the documents. And the contractor looks at the documents and leaves without the documents but now knows what the documents say and can use that to the benefit of the contracting enterprise, whatever that may be. You don't think in that situation the documents cease to be subject to the inviolability? That's correct. And then if that's true, then does it make all the difference if the country then says, instead of having you come over here, here's what I'm going to do. I'm going to give you these documents, but here's all the conditions. It's exactly the same conditions that I would have imposed on you if you came onto my premises. I'm going to take them to you in an armored truck. My security guard is going to be standing right next to you while you look at the documents. I'm going to take them from you, and then I'm going to take them back.  Third, in the hands of barriers, in effect of barriers with protection like that, then I think there's an argument that they're still on the mission. I see, okay. So it's not a premises-specific. It's once in the hands of barriers or diplomatic vouchers or on the premises of the embassy. But again, this court doesn't need to reach those kinds of issues. There's no question that even under the Cutter's framework, which is a made-up framework, but that it depends on the expectation of confidentiality, there's no way that a country could have an expectation of privacy when it turns over documents to Federal Registered Agents. That might be why they lose on a document-by-document review, but it doesn't suggest why there should be a category. But if the documents are open to the inspection by the government at any time for three years after the end of the agency of the relationship, how can they have an expectation of privacy when they respect the confidentiality of any of those documents? Can you just clarify what the document request that's at issue says? What does it request? There are four categories of documents. Communications between Cutter and the defendants, payments by Cutter to the defendants, a whole series of questions like that. And by the way, Cutter professes ignorance as to what these documents are. These documents are three categories. Documents they sent to the defendants, documents they received from the defendants, and what they claim are documents between and among the defendants. They know what those documents are. They certainly know what the information is that they claim is so sensitive and inviolable. They could have made a showing to the district court. But do we know that all of the documents that fall within the document request would be subject to the record-keeping and inspection requirements of FARA? I believe that the inspection requirements of FARA registration is required to keep pretty much all documents. You look at FARA, it's a very broad requirement. And they have to keep the documents open for inspection at any time. So it's your position, I'm just trying to understand your position, that every document that would be responsive to the document request would fall within FARA's record-keeping and inspection requirements? Certainly the document, at a minimum, all the documents that FARA professes to be concerned about would be. Mr. Benson, wouldn't that require a quite broad ruling from us, though, to determine that any documents that were available potentially in the future to inspection by the U.S. government trumps any Article 24 protection that the documents might have? It doesn't trump Article 24 protection. The Vienna Conventions provide, just like Qatar's contracts provide, that they're subject to the law. The Vienna Conventions in Article 41 say that the laws of the host country must be respected. So the countries who adopted the Vienna Convention, including Qatar, I believe in 1961, knew about FARA. They knew about, they obviously adopted Article 41, which said that they agreed to respect laws of the host country. So there's no, I don't think that there's an argument that, we're not arguing that FARA trumps the Vienna Convention. We're arguing that it's perfectly consistent with the Vienna Convention. Well, but that to the extent something is covered by FARA, that to the extent that a document is covered by FARA, that it cannot receive the protections of the Vienna Convention. It's not inviolable. It's no longer inviolable by the actions of the country itself. I mean, the Department of Justice doesn't take that view. I mean, they are charged with enforcing both, I mean, the U.S. government is charged with enforcing both its treaty obligations and its statutory obligations, and they think that they are, in most instances, compatible. I think that the government is wrong. I think they're plainly wrong. I think every authority that has addressed this issue has come down the way Professor Demza has come down, which is documents delivered to people subject to FARA are not inviolable under the Vienna Convention. Well, I think you kind of can't have it both ways. I mean, you say that inviolable under the Vienna Convention is, you know, is the same as the attorney-client privilege is considered to be inviolable. But there are limited exceptions where privileged documents might be able to be reviewed for some purposes but not disclosed for other purposes. And so why can't it be under the Vienna Conventions that it's still considered inviolable? Maybe under U.S. domestic law, there's some limited availability for the Justice Department to inspect documents for its compliance purposes, for its counterespionage or national security purposes. But that doesn't mean that every Tom, Dick, and Harry that files a civil lawsuit can have access to the documents. There's no authority or support in the Vienna Conventions or in FARA or any other law that would support that. But even more importantly, what Qatar is arguing for and what the government is arguing for is analysis of what the reasonable expectations of Qatar were. And attorney-client privilege is a longstanding doctrine that's asserted every day. This inviolability for FARA documents that are exposed to the public, I mean, that are available for inspection, every authority that's ruled on it has agreed with our position. And so when Qatar signed those contracts with these defendants, they knew that Congress said that those documents would be not inviolable. They knew that Professor Densa said that those documents would not be inviolable. They knew that the House of Lords had ruled that those documents given to a certain, a broad array of third parties would not be inviolable. They knew, they didn't have any reasonable expectation of confidentiality or inviolability. They couldn't have. So under their own analysis, these documents are not inviolable. Because of FARA. Because of FARA. Because of all the authorities before they signed the contract. Contracts that agreed with that analysis. About FARA. About FARA. Yeah. Can I just ask a basic factual question? Is it the case that every third party that contracts with a foreign sovereign has to register as a, I take it there's some contractors that don't have to be subject to FARA. Or is that wrong? I think that's correct. I think it's directed toward contractors that are, I mean a lot of times people I think register out of excessive caution. Just, you know, it's a criminal offense. But I don't believe that, for example, if a plumber who does work for a cutter would have to register. I think it's these kinds of activities, propaganda activities. And the purpose of FARA, of course, is to make sure that those clandestine activities are subject to exposure and subject to the government finding out about them. So can I ask this question then? If it's true that not everybody who contracts with a foreign sovereign is subject to FARA, then if you go to a foreign country, and let's just hypothesize a foreign country that's a surveillance state that wants to surveil everything, then they pass something that's much more robust than FARA and just say, every time an embassy within our borders does any business with any third party, any documents they share are subject to surveillance by the government, subject to review by the government. Then would the FARA argument mean that in that country that the Vienna Convention basically just doesn't apply, the inviolability principle just doesn't apply to any document period because there's this law, this hypothetical law that just allows for robust… No, no, it wouldn't. Because they're changing the expectations of the countries, of the parties, the Vienna Convention. The Vienna Convention was signed on to by these countries knowing that FARA existed. It's temporally. The answer from your perspective is that that law postdates, whereas FARA predated. So there would be an argument that, no, it does not override. So if there were a country that had that law beforehand, then… Then there would be an argument. Then that would put the situation across the board, even though it would be a very robust non-inviolability. Right. Okay. If there's no further questions. Thank you. Thank you, Mr. Benson. Thank you. Mr. Zients, we'll give you three minutes for rebuttal. Thank you, Your Honor. Just a few quick points. One, on the comity question, going back to Chief Justice Robertson's colloquy with Mr. Totaro, I agree that comity does matter. Right now, you know, the question before about, you know, there's a limited remand. What is still open in the district court? There is a categorical ruling right now that comity is not available. The district court reached without looking at anything, without developing a record. You know, the United States hasn't commented in this proceeding. It read the court's order. It's not requesting it. In the NML case in the Supreme Court, we think that what the United States said about comity, and in particular, comity in the context of discovery targeted at third parties, is entirely inconsistent with the district court's categorical order. So in our view, you know, that is a separate and important issue in this appeal that there should be a result. And I endorsed what Mr. Totaro said, that, you know, document of the mission is a particular phrase, particular construct. We think that will be quite protective on remand. But international comity is a different way of getting at protection in appropriate circumstances of sensitive governmental information. And it very well may be that there could be some close questions under the Vienna Convention where there is an easier answer once you get into the documents on comity. So we think that is an issue that is presented to the court. And, you know, having the court's person back on that issue would be helpful for remand proceedings. On jurisdiction, I don't want to, you know, unless the court has questions, I don't want to belabor that point. I do just want to create a factual point that I believe Mr. Saunders said. He referred to the minute order of December 8, 2021 as deciding that Cutter had amicus status. The court said that Cutter could file the equivalent of amicus briefs, but no pending motion requires addressing Cutter's exact status in this case. I don't think the district court ever, you know, changed that until it retroactively said in its final decisions here that actually Cutter really was just in amicus all along. So I think, you know, Cutter really was proceeding through this minefield without a compass. And it would be troubling for a foreign sovereign to basically be deemed to have given up its rights under a treaty for not doing it one particular way. Finally, on the FARA points, going to the last point that was addressed about reciprocity concerns. This is not hypothetical. Russia has a FARA type law that has government inspection provisions. And so I think, you know, I would take seriously that the United States has not endorsed Mr. Brody's position that FARA justitiates any inviolability under the conventions. I think there is, you know, I think we would argue is that the best view is that inviolability could be argued in the case of the DOJ came knocking. But the court really doesn't need to get into that. I think this consent concept exists in the treaty in Article 22. You know, inviolability of mission premises is rejected. The next sentence talks about the possibility of consent. You know, it is possible that you could view sort of the decision to engage a contractor under FARA's regime, understanding that it is only law enforcement officers not concerned with snooping around in the sovereign secrets but focused on enforcement of FARA, that that could be a way forward, that that could be assumed to be correct in a way that doesn't undermine inviolability in this proceeding. Let's suppose we find that the only path available to you is mandamus. Ordinarily, we deny mandamus unless there is some clear precedent that demonstrates that the district court's position was error, not for something where the district court, you know, clearly used like there was a standard that's been articulated in the case law and the district court did not use that standard. How do you meet that standard here? Your Honor, a couple of responses. One, I think this court and others, particularly in the context of foreign sovereigns, have taken a more pragmatic view of the threshold for mandamus review. This court's decision in Papandreou, I think, makes that point, that when you talk about your potential injury to a foreign sovereign, the court is going to be a little bit more forward-leaning in recognizing those types of arguments. This comes up also in context of executive branch privileges. We cited the Karnofsky case in the Ninth Circuit, where I don't think it was sort of clear error that normally might have triggered, but because of the broad issues raised by the deliberative process, the issue in that case was reviewed on mandamus. That said, I think the normal standard is met. Here, we don't have, you know, this is a complex and novel issue. There's also one that at least now we have the United States government saying that this treaty interpretation by the district court was wrong. We had asked the district court, you know, we think that you should defer decision until you go through a document-by-document process. We asked the district court if you are inclined not to do that. This is really sensitive stuff, and we think you should ask the district court. Did the defendants ask to do that? Pardon? Did the defendants make that request? Your Honor, I don't recall that they did. That gets me back to my problem, I guess, maybe as an old former district court judge and trial court litigate. Is that, like, now you're wanting us to say that the district court erred because it didn't take an approach that wasn't put to it by a party? Your Honor. And then Mikas can't preserve issues. Your Honor, I think I go back to where I started a few minutes ago. The district court didn't tell us that we were in amicus at that point, said that I don't need to resolve your exact status yet. So I think we were just operating without guidance about what the best way to do this was. The issue is there. I really made that point only for the very limited purpose that we know now that the United States government, which is entitled to great deference in treaty interpretation, agrees with us that the district court was wrong. We had suggested that there was a way to find out the United States position earlier in the day. That was my limited point. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Wilkins, Rao